UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

SCHNEIDER NATIONAL LEASING, INC.,

    Plaintiff and Counterclaim Defendant,

    v.   Case No. 17-C-672

UNITED STATES OF AMERICA,

    Defendant and Counterclaim Plaintiff.

---

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

Section 4051 of the Internal Revenue Code (I.R.C.) imposes a 12 percent tax on the first retail sale of "tractors of any kind chiefly used for highway transportation in combination with a trailer or semitrailer." 26 U.S.C. § 4051(a)(1)(E). Schneider National Leasing, Inc. (SNL), filed this action against the United States seeking a refund of its partial payment of the $9 million in federal excise taxes the Internal Revenue Service (IRS) assessed SNL for the purchase of 976 truck tractors during the tax years 2011, 2012, and 2013 pursuant to § 4051, and the abatement of the unpaid assessments. SNL claims that the alleged tractor purchases were instead non-taxable refurbishments of its previously purchased tractors that fall within the safe harbor provision of the Code, I.R.C. § 4052(f). Section 4052(f) exempts from the tax repairs or modifications of tractors "if the cost of such repairs and modifications does not exceed 75 percent of the retail price of a comparable new article." The United States denies that the safe harbor applies and filed a counterclaim for the balance of the unpaid assessments. The parties stipulated to most of the facts, and a bench trial was held on those in dispute on February 5, 2020. What follows are the court's findings of fact, conclusions of law and decision.

## BACKGROUND AND EVIDENCE

SNL is a corporation wholly owned by Schneider National, Inc. Schneider National, through its subsidiaries (collectively Schneider), has operated a truckload freight transport business since 1935 from its headquarters in Green Bay, Wisconsin. Stipulation of Facts (SOF), ¶¶ 2–3, Dkt. No. 33. Schneider uses truck tractors and trailers to move freight with trailers pulled by over-the-road truck tractors. *Id.* at ¶ 4. SNL leases truck tractors and trailers to Schneider, including most of the truck tractors and trailers used by Schneider during the periods relevant to this action. *Id.* at ¶¶ 5–6. Because of the size of the company, SNL regularly purchases new tractors either to replace older trucks or add to its fleet.

Between 2003 and 2010, the addition of environmental controls needed to meet the emission standards for new trucks, such as exhaust gas recirculation (EGR), added weight and led to significant drops in fuel efficiency in the new tractors SNL was purchasing. As the newer models were introduced, there was also uncertainty as to their reliability as the "bugs" in the new technology were worked out over time. In response to these changes, SNL began looking for a way to maintain the advantages of its older more reliable and fuel-efficient trucks. It found such a way when Riley Asher, a former Schneider employee, now working for Clarke Power Services, Inc., proposed that SNL replace or refurbish their older tractors with glider kits instead of purchasing new trucks.

During the tax periods at issue, SNL arranged for 982 of its truck tractors to undergo what it calls a "Refurbishment Process." SNL referred to the 982 tractors as "donor" tractors. The donor tractors included substantially all of Schneider's pre-EGR trucks, those that were not equipped with the newer technology that added weight and reduced fuel efficiency. Over 95 percent of the donor tractors were Freightliner Columbia 120 tractors and consisted of two cab

types: sleeper and day cabs. SNL had previously paid the federal excise taxes required under § 4051 when it purchased the donor trucks new.

The donor tractors were transported from Schneider's facilities to the facilities of certain outfitters, primarily Clarke Power Services, Inc. SNL also purchased 982 glider kits from Daimler Trucks North America LLC (Daimler). *Id.* at ¶ 15. Daimler gave SNL a volume discount or "concession" consisting of a price reduction of approximately 30 percent from Daimler's list price for each kit. The glider kits contained new or remanufactured parts for Freightliner Columbia 120 tractors. Each kit included at minimum:

> a cab (with all instruments and controls), chassis (frame rails), radiator, front axle, front suspension, front wheels, front tires, front brakes, brake system (air tanks and air lines), and trailer connections (air hoses and electrical cables).

*Id.* at ¶¶ 18–19. Of the glider kits that SNL purchased, 912 were "powered" glider kits that also included a remanufactured Detroit Diesel 12.7 liter engine, and 70 were "non-powered" or "rolling" glider kits that did not include an engine. *Id.* at ¶ 20.

SNL did not pay federal excise taxes under I.R.C. § 4051 upon its purchase of the glider kits. *Id.* at ¶ 21. The glider kits, like the donor tractors, were transported to the outfitters' facilities, where the Refurbishment Process occurred. During the Refurbishment Process, the outfitters' employees stripped or "harvested" the parts from the donor tractors and added new or used parts to the glider kits. Parts from the donor tractors that were not used on the glider kits were (a) recycled as replacement parts for use in repairing SNL's other truck tractors, (b) sold for salvage value, or (c) in the case of used engines, sent to Daimler in exchange for a rebate/credit on another engine included in a glider kit. *Id.* at ¶ 24. The harvested parts usually included the transmission, driveline, rear axle, rear suspension, and rear wheel hubs, and sometimes included the fuel tank, fifth wheel, and/or rear brakes. The more fuel-efficient engines from the donor tractors that were

3

sent to Daimler were remanufactured and then included in powered glider kits that Daimler sold to SNL. Remanufacturing an engine involved more than repairing an engine. It required reducing it to its most basic, smallest parts, and then putting them back together, sometimes with new parts. The result was closer to a new engine than a repaired engine.

Once the process was completed, SNL leased the 982 "refurbished" tractors to Schneider under long-term leases within the meaning of I.R.C. § 4052(e). *Id*. at ¶ 25. Each of the 982 tractors resulting from the Refurbishment Process was of the kind chiefly used for highway transportation in combination with a trailer or semitrailer. During the process, SNL retained title to the donor tractors, the glider kits, and the tractors resulting from the Refurbishment Process. Once the process was complete, Schneider no longer used the donor tractors' vehicle identification numbers ("VINs") for state or federal regulatory purposes. *Id*. at ¶ 29. Each glider kit that SNL purchased from Daimler had its own unique serial number that followed the length and formatting standards for VINs. *Id*. at ¶ 30. Once the process was complete, Schneider used the serial numbers of each glider as a VIN to identify, for state and federal regulatory purposes, each truck tractor that resulted from the process. *Id*. at ¶ 31.

While the Refurbishment Process was ongoing, SNL also purchased 61 new Freightliner Cascadia 125 truck tractors (model years 2011 through 2013). These new truck tractors were purchased directly from Daimler, an original equipment manufacturer, instead of from a dealer or dealership. *Id.* at ¶ 34. Daimler invoiced SNL for the excise taxes owed on these new truck tractors; Daimler then paid the taxes to the IRS. For purposes of the safe harbor provision contained in § 4052(f), the parties agree that the Freightliner Cascadia 125 truck tractors with Detroit Diesel 12.8 liter engines, and with model years and cab types (sleeper or day)

4

corresponding to those of the glider-kit tractors that resulted from the Refurbishment Process, are comparable new articles for those corresponding glider-kit tractors.

After each fiscal quarter, SNL is required to complete a Quarterly Federal Excise Tax Return (IRS Form 720) and report any federal excise taxes owed under § 4051, among other things. *Id.* at ¶ 49. SNL determined that it was exempt from the 12 percent federal excise taxes on the 982 refurbished tractors under § 4052(f) during the Disputed Tax Periods. In arriving at this position, SNL relied upon the advice of employees of its accountants and the Washington National Tax Office of KPMG LLP, who were former IRS employees working in the federal excise tax area.

The IRS examined the federal excise tax returns SNL had completed for the Disputed Tax Periods. SNL consented to and paid on February 2, 2015, additional taxes on the installation of certain equipment on its trailers, which had been owed under § 4051 and omitted from its Form 720 returns filed during the Disputed Tax Periods. On July 25, 2016, the IRS assessed SNL additional excise taxes under § 4051 in the amount of $9,387,403.73 (plus interest) on 976 of the 982 refurbished tractors utilized during the Disputed Tax Period. *Id*. at ¶ 56. The IRS assessed § 4051 excise taxes on the refurbished tractors arising from all 912 of the powered glider kits and 64 of the 70 non-powered glider kits. With respect to the powered glider kit refurbished tractors, the IRS claimed that Schneider's manufacture and subsequent use or lease of the refurbished tractors did not meet the "safe harbor" provided by § 4052(f) because Schneider had not "repaired or modified" articles for purposes of that section. *Id*. at ¶ 59. The IRS alternatively claimed that, even if the § 4052(f) safe harbor provision applied, Schneider owed taxes because the cost of the repairs on many of the powered glider kit refurbished tractors exceeded 75 percent of the retail price of a comparable new tractor. *Id*. With respect to the 64 non-powered glider kit refurbished

5

tractors, the IRS claimed that Schneider owed taxes under § 4052(f) because the cost of the repairs exceeded 75 percent of the retail price of a comparable new tractor. *Id*. at ¶ 60.

The IRS provided SNL notice of its July 25, 2016 assessment. SNL paid the assessed excise taxes (including interest) for 12 of the 976 refurbished tractors on August 4, 2016; it subsequently filed a claim for refund for the amount paid in November 2016. *Id*. at ¶¶ 66, 68. The IRS denied SNL's claim for refund on December 28, 2016. *Id*. at ¶ 70. SNL commenced the present tax refund suit by filing a complaint on May 12, 2017. It seeks recovery of the taxes and interest paid on August 4, 2016 (plus interest and costs) and abatement of the remainder of the excise taxes and interest assed against it on July 25, 2016. The United Sates filed its counterclaim on August 16, 2017, which seeks the unpaid balance of the July 25, 2016 assessment (plus interest and costs), reduced to judgment.

The court granted-in-part and denied-in-part the United States' motion for partial summary judgment on July 23, 2019. Dkt. No. 30. There, the court held that the "retail price of a comparable new article" in § 4052(f) excludes any federal excise taxes imposed under I.R.C. § 4051.

## ANALYSIS

Two key points of dispute remain in this action. First, the court must decide whether the safe harbor provision contained in § 4052(f) applies to the 912 tractors that were refurbished/assembled with the powered glider kits. (For purposes of the present action, the United States is not contesting whether the safe harbor applies to the 64 refurbished tractors for which non-powered glider kits were used. *See* Dkt. No. 35 at 6–7.) Second, assuming the safe harbor applies, the court must interpret how "retail price" should be calculated for purposes of § 4052(f). The parties agree that once the court decides these two issues, they will be able to perform the calculations needed to determine the amount of the tax that is due.

6

## A. Applicability of the Safe Harbor Provision to the Refurbished Tractors Arising from the Powered Glider Kits

Under 26 U.S.C. § 4051(a)(1)(E), a 12 percent tax is imposed on the first retail sale of tractors of the kind chiefly used for highway transportation in combination with trailers or semitrailers. The tax is imposed on the first sale of tractors after production, manufacture, or importation. § 4052(a)(1). It is not imposed on tractors that merely undergo certain repairs and modifications. Section 4052(f)(1) provides:

> [a]n article described in section 4051(a)(1) shall not be treated as manufactured or produced solely by reason of repairs or modifications to the article (including any modification which changes the transportation function of the article or restores a wrecked article to a functional condition) if the cost of such repairs and modifications does not exceed 75 percent of the retail price of a comparable new article.

The question presented here is whether SNL's Refurbishment Process using the 912 powered glider kits resulted in repairs or modifications to the donor tractors within the meaning of § 4052(f), or whether what SNL called the Refurbishment Process resulted in the production or manufacture of a new or different tractor, using both recycled and new parts.

SNL argues that its Refurbishment Process clearly falls within the scope of the § 4052(f) exemption, and the only issue is whether the cost of the refurbishment exceeds 75 percent of the retail price of a comparable tractor. SNL contends that in order to avoid the vexing and almost metaphysical question of when changes in an article's components constitute the manufacture or production of a new article, *see, e.g., Boise National Leasing, Inc. v. United States*, 389 F.2d 633 (9th Cir. 1968); *Ruan Financial Corp. v. United States*, 976 F.2d 452 (8th Cir. 1992), Congress chose to create in § 4052(f) a mathematical formula to mark out the contours of the exemption. That formula, or safe harbor, asks only whether the costs of the process undertaken with the

7

existing articles, regardless of what it entailed, exceeded 75 percent of the retail price of a comparable new article.

The United States, on the other hand, argues that before you even get to the mathematical formula, there must be a repair or modification of an existing tractor. SNL's "Refurbishment Process," the United States contends, consists in the destruction of the old "donor" tractors and replacing them with a new or at least different tractor produced with a glider kit. Instead of refurbishing the donor tractors, what SNL actually did, according to the United States, was take a few parts, generally the rear axles and transmissions, from the donor trucks and add them to the powered glider kits to produce a new truck complete with a new VIN. Because the process was not a repair or modification of an existing tractor but the production of a different tractor, the United States contends that § 4052(f) does not apply.

"When attempting to decipher the proper interpretation of a statute, we begin by determining 'whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.'" *River Rd. Hotel Partners, LLC v. Amalgamated Bank*, 651 F.3d 642, 648–49 (7th Cir. 2011), *aff'd sub nom. RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 (2012) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)). "When interpreting statutory language, the meaning attributed to a phrase 'depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis.'" *Id.* at 649 (quoting *Kasten v. Saint–Gobain Performance Plastics Corp.*, 563 U.S. 1, 7 (2011)). "If we find that the language in a statute is unambiguous, we will not conduct further inquiry into its meaning and enforce the statute in accordance with its plain meaning." *Id.* The IRC's "provisions dealing with deductions, exemptions, and exclusions are matters of legislative grace," which the court narrowly construes.

*Stinson Estate v. United States*, 214 F.3d 846, 848 (7th Cir. 2000). The taxpayer has the burden to show that it was appropriate to rely on the exemption at issue. *Id.* (citing *Commissioner v. Disston*, 325 U.S. 442 (1945)).

SNL believes Revenue Ruling 91-27 supports its position that the production of its refurbished tractors was a non-taxable event because they fell within the § 4052(f) exemption. *See* Rev. Rul. 91-27, 1991-1 C.B. 192 (1991). Revenue Rulings are one form of guidance the IRS provides to taxpayers. *See* Treas. Reg. 26 C.F.R. § 601.201. However, unlike Treasury Regulations, which interpret the IRC and are issued after a public notice and comment period, Revenue Rulings are not subjected to similar pre-issuance public review. *First Chicago NBD Corp. v. Comm'r*, 135 F.3d 457, 459 (7th Cir. 1998); *see also* Treas. Reg. 26 C.F.R. § 601.201. In the Seventh Circuit, Revenue Rulings "receive the lowest degree of deference." *Bankers Life & Cas. Co. v. United States*, 142 F.3d 973, 978 (7th Cir. 1998). Put differently, Revenue Rulings are entitled to "less weight" than Treasury Regulations, but this does not mean "no weight." *First Chicago*, 135 F.3d at 459. Generally, in the view of the IRS, taxpayers "may rely upon Revenue Rulings," but because they involve a particularized set of facts, the IRS cautions against "reaching the same conclusion in other cases unless the facts and circumstances are substantially the same." *See* Treas. Reg. 26 C.F.R. § 601.601(d)(2)(v)(e). In United States Tax Court, "Revenue rulings do not ordinarily constitute authority" because "'absent special circumstances, a revenue ruling merely represents the Commissioner's position with respect to a specific factual situation.'" *Tandy Corp. v. Comm'r*, 92 T.C. 1165, 1170 (1989) (quoting *Stark v. Comm'*, 86 T.C. 243, 250–51 (1986)). Thus, Revenue Ruling 91-27 does not constitute binding authority. But even if it did, this would not change the result.

9

Revenue Ruling 91-27 considers a fact pattern in which the useful life of a used tractor (chiefly used for highway transportation with a trailer or semitrailer) is extended by its owner adding new components to it and rebuilding others. Though the restoration was extensive, the cost was only 65 percent of the price of a comparable new tractor. Rev. Rul. 91-27, 1991-1 C.B. 192 (1991). The Revenue Ruling holds that "because the cost of the restoration of the worn tractor did not exceed 75 percent of the price of a comparable new vehicle, no retailers excise tax is imposed on the sale or use of the tractor." *Id*. The Ruling further states: "This holding will also apply in cases where the owner uses a glider kit to repair the vehicle, so long as the cost of the repair does not exceed 75 percent of the price of a comparable new vehicle." *Id*. SNL reads this language to mean that the mathematical formula is the sole determinant whenever a glider kit is used along with part of a previously purchased tractor. But the holding applies only where a glider kit is used "to repair the vehicle," not when a glider kit becomes the new vehicle. The Ruling does not state whether the glider kit in the former example was a powered or non-powered gilder kit.

In other words, both Rev. Rul. 91-27 and § 4052(f) presume repairs or modifications to a specific tractor, not the replacement of one tractor with another built with a powered glider kit and a few parts of the one to be replaced. Before the mathematical formula comes onto play, there must be a showing of a repair or modification of an existing article. If instead of the repair or modification of an existing tractor, SNL's process resulted in the creation of a new or different tractor, § 4052(f) does not apply. To adopt SNL's reading of the exemption would read the words "repairs or modifications to the article" out of the statute. The exemption applies to repairs or modifications to a tractor; not the use of a few parts from one article to produce a new or different one. Here, the only significant components of the donor tractors used with the powered glider kits were the rear axles and transmissions. Once the re-usable or salvageable parts were removed, the

10

remainder of the donor tractors were destroyed. They were not repaired or modified. Thus, § 4052(f) does not apply to the 912 tractors created with the powered glider kits.

### B. Retail Price of Comparable New Articles

The parties also dispute how "retail price" for the purpose of § 4052(f)'s safe harbor should be calculated. The United States contends that the retail price means the discounted price SNL actually paid for the Freightliner Cascadia 125 truck tractors that the parties have stipulated are comparable new articles for the corresponding glider-kit tractors. SNL argues that the retail price means not its discounted price but the price a willing purchaser would pay for the Freightliner tractors. SNL's expert, Dr. George G. Korenko, concluded that the "Truck Blue Book" retail prices are the appropriate benchmark because SNL did not purchase its truck tractors through the typical supply chain (because it was a large scale purchaser). Pl.'s Ex. 6 at 4–5. According to Dr. Korenko, it would be inappropriate for the IRS to use SNL's own purchase price for calculating the "retail price" for purposes of the safe harbor because the price SNL paid was substantially lower than the industry retail price. *Id.*

The retail price is the price paid at the first retail sale. The term "first retail sale" is defined by the I.R.C. as "the first sale, for a purpose other than for resale or leasing in a long-term lease, after production, manufacture, or importation." § 4052(a)(1). SNL's purchase of the comparable Freightliner tractors constitutes the first retail sale of those tractors, and so the price it paid constitutes the retail price as used in § 4052(f). It thus follows that for those tractors to which § 4052(f) applies, no tax is owed unless the cost of the modifications or repairs exceeded 75 percent of the price SNL paid for the comparable new Freightliner tractors.

This reading of the statute is consistent with the congressional intent. As the United States contends, Schneider should not be allowed to pay the excise tax on the amount it paid for the article

11

under § 4051 and be permitted to qualify for the safe harbor under § 4052(f) using undiscounted retail prices paid by *others* in the market for comparable truck tractors. While the statute does not fully define the safe harbor's use of the phrase "retail price of a comparable new article," there should be a logical bridge between the excise tax imposed under § 4051 and the exemption from from the tax under § 4052(f). Finding otherwise would result in the court extending the safe harbor beyond what Congress intended and exempt a much broader scope of transactions than what Congress envisioned.

The legislative history is in accord, as it shows that Congress considered "whether the cost of the modification exceeds 75 percent of the value of the *modified vehicle*." H.R. Conf. Rep. 105-220, at 727 (emphasis added). Like the sophisticated taxpayer who would be making the decision to repair a tractor or purchase a new one, Congress knew that the relevant price point would be what the taxpayer would pay for a new article, *not* what another competitor in the market may pay. SNL's testimony shows that this was the consideration it made when deciding whether the glider-kit Refurbishment Process was a viable financial alternative to purchasing new tractors; it did not consider what its competitors paid for purchasing new tractors, but what it would pay.

### C. Statute of Limitations

The parties have stipulated that the July 25, 2016 assessments for all quarters in 2011, the first two quarters of 2012, and the first quarter of 2013 are timely for purposes of 26 U.S.C. § 6501(e)(3). SOF, ¶ 58. The timeliness of the assessments for the remaining quarters in 2012 depends on whether the unpaid excise tax exceeds 25 percent of the gross income reported on SNL's returns for the periods in question. *See id.* As this amount cannot be calculated until the parties compute the amount of tax due in accordance with the court's conclusions as stated herein,

12

the court will defer ruling on this issue, if it remains outstanding, until after the parties confer following this decision.

## CONCLUSION

Based on the foregoing findings of fact and conclusions of law, and consistent with the parties pretrial requests, the parties will have 30 days from the court's entry of its findings of fact and conclusions of law herein to confer, perform calculations, and attempt to agree on the amounts due to the United States on its counterclaim in accordance with the court's opinion. The court further **ORDERS** the parties to file, within those 30 days, either a stipulation as to the amount of the final judgment in favor of the United States or separate briefs explaining their respective positions regarding any remaining issues in dispute.

Dated at Green Bay, Wisconsin this   11th   day of September, 2020.

>                             s/ William C. Griesbach
>                             William C. Griesbach
>                             United States District Judge